## STATE v. CHARLES COUPLIN.[1]

### June 25, 1920.

### No. 21,767.

**Grand larceny — conviction sustained by evidence.**

1. The evidence considered and *held* sufficient to sustain the verdict.

[1]Reported in 178 N. W. 486.

**Trial — improper argument of prosecutor — failure to object.**

2. The language used by the prosecuting attorney in the closing argument to the jury, though at times subject to criticism, was not of the sort that when once uttered no act or admonition of the court could thereafter cure the harm done and secure a fair trial, hence defendant should have sought redress while it could be had, and should not be allowed to treasure up the alleged misconduct for use in the event of an adverse verdict.

**Charge to jury.**

3. The charge of the court when considered in its entirety is not erroneous or misleading.

**Request was covered by the charge.**

4. The requested instruction was sufficiently covered by the charge.

Defendant was indicted by the grand jury of Hennepin county, charged with the crime of grand larceny in the first degree, tried in the district court for that county before Jelley, J., and a jury which found him guilty as charged in the indictment. From an order denying his motion for a new trial, defendant appealed. Affirmed.

*George R. Smith, H. Stanley Hanson* and *Leo J. Gleason,* for appellant.

*Clifford L. Hilton,* Attorney General, *John E. Palmer,* Assistant Attorney General and *William M. Nash,* County Attorney, for respond-

HOLT, J.

Defendant was convicted of the crime of larceny in the first degree, and appeals from the order denying his motion for a new trial.

The errors assigned challenge the sufficiency of the evidence; the conduct of the prosecuting attorney; the charge of the court, and the refusal to give requested instructions.

1. Defendant was jointly indicted with Philip Morgan and Frank P. Levine. The last named pleaded guilty to larceny in the second degree, and testified for the state in the trial of this defendant, as well as in the separate trial of Morgan. There is no question but that, on Saturday night, June 29, or early Sunday morning, June 30, 1918, the store of J. B. Wicks & Company in Minneapolis was entered, by cutting a hole through the tile partition separating it from

an adjoining unoccupied store, and over $23,000 worth of fur garments feloniously taken. Not later than the afternoon of July 3 these goods were in the attic of the defendant's home in St. Paul, and over $14,000 worth thereof there remained until recovered by the police on August 13, 1918. In addition to price tags, upon all the new garments in the lot were sewed on small name plates of the firm. There were also several Hudson seal garments which were being repaired belonging to customers. These had tags giving the name and residence of the owner.

Defendant and Morgan were partners in the diamond business, and each had for years run a pawnbroker's business in St. Paul. The pawn shops were within a stone's throw of each other on Seventh street. Both were also interested in a clothing store near by. Levine was running a haberdashery in his wife's name at 495 St. Peter street, St. Paul. Defendant's story was that on July 3 Levine said he had a lot of furs to buy and wanted to know if Morgan and defendant would go in on the deal; that Levine's proposition was accepted; that defendant procured a truck from Kelly's Transfer Company, and with Levine went to Sweeney's Dye House, 483 Wabasha street, St. Paul, took the furs, packed in barrels and sacks, to his home and placed them in a spare room upstairs; that, while this was being done, three well dressed men came up and Levine introduced them to defendant as the owners of the furs; that without defendant or Morgan having examined the goods they, through Levine, offered to pay $2,000 for the lot; that the offer was declined; that thereupon Morgan left, and defendant telephoned for the transfer company to come and take the goods away, but in the meantime Levine had agreed to pay the men $2,500, which was accepted. The defendant furnished the money. Levine's testimony was that the furs were never in Sweeney's Dye House; that on July 1 Morgan and defendant called him in and proposed that he sell a lot of furs they had on commission; that on the same day he went to defendant's home and examined the goods, they then being in the attic; that a few days later they proposed that Levine should pay $500 for a third interest in the furs, and that defendant said they would have to lay low for some time before any effort could be made to dispose of them. There

is no question but that some items were disposed of by both Levine and the other two, nor that some prospective. purchasers from Minneapolis were induced by Levine to come to defendant's attic to examine these furs. One of these, for a reward, revealed the hiding place to the police, and the arrest and indictment followed.

It is the contention of defendant that the testimony of the state shows no other offense than that of buying stolen property knowing it to be such (section 8886, G. S. 1913). We do not think the jury were bound to accept the testimony either of defendant or of Levine as wholly true. Neither one rings true as to his own part in the crime. We need not call attention to the various witnesses who in part corroborated the one or the other. There were such. The witnesses from Sweeney's Dye Store refute defendant's story, but those from Kelly's Transfer Company substantiate it. It was the function of the jury to determine between them. The fact remains that this large quantity of valuable furs, within one day, or at the most three days, after being feloniously taken, was in defendant's possession. This alone was a circumstance from which the jury might infer that he was concerned in the taking. State v. Miller, 45 Minn. 521, 48 N. W. 401; State v. Monroe, 142 Minn. 394, 172 N. W. 313.

There was testimony that a few days, after the goods were taken to defendant's attic Levine and Couplin removed the name plates that were sewed on the garments. Thieves would not be likely to offer strangers to the crime the stolen articles with the name plates of the owner upon them. The record discloses that the breaking into the store was planned in advance. Every window and door of the store and basement was protected by a burglar alarm. The ones who perpetrated the crime no doubt knew of this, so they broke through the wall. They had also taken the precaution to lay wires by which a person, stationed some distance from the store, where he could have a clear view of anyone approaching it, could signal those who were engaged in carrying out the burglary. When a scheme of such magnitude is undertaken and with such precautions, there has also been, without doubt, a previous arrangement for the disposition of the fruits of the crime. The actual burglars must have known before they entered the J. B. Wicks & Com-

pany store just where to take the furs. They could not trust them to strangers. The inference is irresistable that the ones who received the goods knew they were coming and were aiding and abetting the crime from the start. At least, it would be a fair conclusion for the jury to draw. Defendant says he was introduced by Levine to the owners of the goods, the three men who appeared at his house almost coincident with the arrival of the truck load of furs, yet he does not recall the name of any one of them. He remained friendly with Levine up to within a few days before the trial, and when they had the same lawyer engaged for their defense, but never was any inquiry made of Levine as to the names or identity of the three alleged owners of the furs. Levine's testimony was that no men came there at all when he was at Couplin's house.

2. The misconduct of counsel complained of occurred in the closing argument to the jury, which was reported by an outside stenographer employed for that purpose by defendant, apparently without the knowledge of the court or the prosecuting attorneys. Neither during the argument nor until after the verdict was there any intimation by way of objection or otherwise that counsel overstepped the proprieties or traveled outside the record, except at one point where the defendant's attorney said he disagreed with the speaker as to what a witness had testified. We do not think a party can thus silently treasure up errors with which to assail a verdict, should it be adverse to him. It is insisted that the sentences now selected out of the address and assigned as improper, were so pernicious that, after once uttered, nothing could be done either by court or counsel to eradicate the evil effect upon the minds of the jurors, hence silence was excusable and the right to raise the objection after verdict remains. Wells v. Moses, 87 Minn. 432, 92 N. W. 334, and Wadman v. Trout Lake Lumber Co. 130 Minn. 80, 153 N. W. 269, are cited. In both cases objections were promptly made as soon as the improper remarks were uttered. The litigant thereby placed himself in a fair position towards his opponent and the court, so that if a remediable error or wrong had been done it might be set right. Orderly practice so requires. For aught that now appears defendant's counsel, in his argument, may have used the alleged improper

146 M.—13.

remarks of the assistant county attorney as a text for effective retaliation in kind, so that the state's case may have been weakened rather than strengthened by the indiscreet remarks of its representative. We do not approve of all that was said in the address of the assistant county attorney. It is dangerously near transgressing the admonition given in State v. Clark, 114 Minn. 342, 345, 131 N. W. 369, namely, for the prosecuting attorney to abstain from expressing his own opinion as to a defendant's guilt. However, taking the address as a whole, and making due allowance for the rhetorical flights and figures which invariably cling to some members of the bar who have acquired fame for eloquence, we are not impressed with the idea that the argument was such that defendant may rightfully complain. The evidence gave a basis for a forcible arraignment of his conduct upon his own story, to say nothing of Levine's. There were many incidents from which the attorney might legitimately lead the jury to infer guilt.

3. The objection to the definition of the quantum of evidence required to convict is not well taken. The court in instructing as to the meaning of the phrase "reasonable doubt" said, in substance that, if, after considering all the evidence, "the jury do not have an abiding conviction amounting to a moral certainty, that is, if they do not feel morally certain that he is guilty," then they have a reasonable doubt and there should be an acquittal. This is correct, and we think it hypercritical to say that this excerpt, either standing alone or taken in connection with the remainder of the charge, permitted the moral certainty of guilt to be derived from any other source than the evidence produced before the jury.

It is contended that the charge placed on defendant the burden to satisfactorily explain his possession of the stolen goods, and that unless he so did he was in law guilty of the crime charged. We think the charge when considered in its entirety does not convey that idea.

The language of the court in stating the claim of the state is, perhaps, somewhat unguarded in this respect, but it was immediately followed by the correct statement of the law, "that the possession of stolen property recently after being stolen by one charged with its theft—and such is the charge here—is evidence of his guilt, but the force of such evidence, however, depends on the facts in each particular case.

Such possession does not raise a legal presumption, a conclusive presumption, of guilt, but it is simply an item of evidence from which the jury may infer guilt." The court then referred to the fact that defendant had undertaken to give a satisfactory explanation and in detail to the contentions of the state and the defendant on that point. Defendant's testimony left it somewhat uncertain whether he was a party to the purchase of the furs, or whether he merely loaned Levine $2,500 and took the goods as security, and also as to whether he claimed his connection with the property was an honest and legitimate transaction with no knowledge of its being stolen or whether he knew all the time that he was holding and secreting stolen goods. So the court, after stating the claims of defendant and the state in that regard, directed the jury to consider the facts and circumstances disclosed by the evidence "surrounding and connected with his possession; if you find he had possession, of the furs soon after they were stolen, and say what force, if any, such possession shall have as an item of evidence from which defendant's guilt of the charge here may be inferred and determine from all of the evidence in the case as a fact whether the defendant has made a satisfactory explanation of that possession, such an explanation as satisfies you that he was rightfully, legally in possession of those furs, if you find he had possession of them, or was wrongfully and illegally in possession of them and holding them intentionally, purposely and unlawfully, secreting them in his attic, after he had been connected with their theft, to enable him the better, as the state claims in this regard, to deprive the true owners of their property and appropriate such property to his own use or the use of others." The next sentence was: "This is for your decision from the evidence, gentlemen, and unless the state has proved the truth of its claims beyond a reasonable doubt the defendant should be acquitted." This shows that even if defendant's explanation was not satisfactory there could be no conviction, unless the state proved, beyond a reasonable doubt, its claim that defendant's possession was intentionally unlawful after he had been connected with the theft of the goods.

We do not think the jury could have been misled into believing that they should convict, unless defendant proved his possession to have

been legitimate so as to come within the condemnation of the rule stated in State v. Hutchison, 121 Minn. 405, 141 N. W. 483. Satisfactory explanation must have been understood by the jury to have meant truthful, and not equivalent to a "reasonable explanation" which was the phrase employed in the case cited. It is undoubtedly true that if a defendant's explanation of his possession of recently stolen property be such that, taken in connection with all the other evidence in the case, a reasonable doubt of his guilt remains, an acquittal should follow. State v. Kimes, 145 Iowa, 346, 124 N. W. 164; State v. Ford, 175 N. C. 797, 95 S. E. 154.

The instruction in respect to aiding and abetting the crime was proper in view of the evidence which, as above intimated, justified the jury in finding that defendant participated in the planning and carrying out of the crime.

We deem other objections to the charge without substantial merit.

4. Defendant's attorney requested the court to instruct the jury that even though defendant was illegally in possession of the stolen property, but had no connection or knowledge of the crime before it was committed, he could not be convicted. Or, in other words, though he were guilty of the crime denounced by section 8886, G. S. 1913 (receiving stolen property knowing it to be such), it would not justify finding him guilty under this indictment. Defendant was entitled to such instruction, but its equivalent was given in the charge in these words: "And something has been said about these defendants having been indicted for receiving stolen property in St. Paul. We have nothing to do with that * * * At the present time this court is trying this case against Couplin and it matters not whether all of these defendants or either of them are indicted in Ramsey county, but we must try this case separately and try no other case here. * * * Take the case, gentlemen, you remembering that this defendant is here on trial charged with grand larceny and that crime alone is being tried before you and nothing else. No matter what he is charged with or to be tried with hereafter, we have nothing to do with that, for, as I say, he is here charged with the commission of the crime of grand larceny and you must find him guilty of that crime or none at all." The court had

previously clearly charged that, unless convinced beyond a reasonable doubt that defendant aided or abetted others to commit the larceny of the furs, as claimed by the state, the defendant was entitled to an acquittal. In our opinion the charge fully covered the request.

We fail to discover any substantial error in the trial.

The order is affirmed.